UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANTHONY PALERMO, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 08-cv-4623 ) ) |
| HILLARY RODHAM CLINTON, Secretary, U.S. Department of State | ) Judge Joan B. Gottschall ) ) |
| Defendant. | ) ) |

## MEMORANDUM OPINION AND ORDER

Anthony Palermo brought this Title VII employment discrimination action against the United States Department of State ("State Department"). Palermo alleges that, after requesting a desk audit, the State Department did not upgrade his job position classification from a GS-11 to a GS-12 position because of Palermo's race and gender, and in retaliation for his previous statutorily protected activity. The State Department filed a motion for summary judgment on all of Palermo's claims. For the following reasons, the State Department's motion is granted.

### I. BACKGROUND

Anthony Palermo, a Caucasian man, has worked at the State Department's Chicago Regional Office since 1995. (Def.'s Rule 56.1 Statement of Material Facts ("Def.'s Stmt.") (Doc. 42) ¶¶ 1-2.)[1] After beginning his career at a GS-5 level,[2] by 1997 Palermo had been

---

[1] Unless otherwise noted, the defendant's statements of facts and the plaintiff's additional statement of facts cited in this opinion are uncontested. However, the court notes that the State Department's Rule 56.1 Statement of Facts contained numerous errors, including citing to the incorrect pages of documents in the record, and to pages of deposition transcripts that it failed to include in the record. (*See, e.g.*, Def.'s Stmt. ¶¶ 8, 22, 26, 32-35, 38, 42, 43, 45, 46.) These errors made a determination of the undisputed material facts extremely difficult because, instead of admitting or denying the underlying purported fact for such a statement, Palermo denied that the cited pages contained the referenced information, or stated that the cited pages were omitted from the record.

promoted to a GS-9 level. (*Id.* ¶¶ 3-4.) Palermo filed an Equal Employment Opportunity ("EEO") complaint alleging gender and race discrimination on November 21, 2003 against his supervisors Britany Williams and Terry Green. (Pl.'s Rule 56.1(b)(3) Additional Statement of Material Facts ("Pl.'s Stmt.") (Doc. 45) ¶¶ 1-2.) As part of an administrative settlement of those complaints, he was promoted to a GS-11 Passport Specialist. (Def.'s Stmt. ¶¶ 5, 25.) On March 22, 2004, Palermo filed another EEO complaint for failure to promote and filed a lawsuit in federal court on September 10, 2004. (Pl.'s Stmt. ¶ 1; Docket for Case 04-cv-05935, Pl.'s Ex. 25 (Doc. 45-3).) As a part of the settlement of that action, Palermo was laterally transferred to the GS-11 position of Passport Operations Officer in May 2005. (Def.'s Stmt. ¶ 6.) When Palermo was transferred into this position, it was new to the Chicago office. (Def.'s Stmt. ¶ 27.) On May 12, 2006, after learning that the Passport Operations Officer was classified as a GS-12 at some State Department offices, Palermo requested that a "desk audit" be performed to determine the proper grade of his position as Passport Operations Officer in Chicago. (Def.'s Stmt. ¶¶ 7, 31.) Palermo initiated another EEO complaint on September 22, 2006. (EEO Counselor's Report, Pl.'s Ex. 2 (Doc. 45-1) at 1-3.)

**A. Desk Audit**

In the State Department, a desk audit is conducted when an employee challenges his or her position's current GS grade to determine if the position is properly classified; the audit can result in the position's classification being upgraded, downgraded, or staying the same. After an employee initiates the desk audit process by submitting a request for the audit to his or her manager, the manager contacts the Washington Passport office with the request, where an official determines if Human Resources ("HR") should look into the issue. (Decl. of Herbert

---

[2] State Department Civil Service employees, as federal employees, are paid using the General Schedule (GS) pay scale, which has fifteen pay grades (GS-1, the lowest grade, to GS-15, the highest grade) with ten steps at each grade. *See* U.S. Department of State Benefits Overview, http://careers.state.gov/work/domestic/benefits.

Casey ("Casey Decl."), Def.'s Ex. 13 (Doc. 42-7), ¶ 7.) HR conducts the desk audit by speaking with the employee to get a list of the employee's duties; this information is then sent to the employee's managers for verification that the employee performs the tasks identified. (*Id.*)

The State Department has sixteen regional passport issuance facilities. (Def.'s Stmt. ¶ 20.) The decision to classify positions at such facilities is done by the Personnel Office and Passport Operations Office in Washington, D.C.; the regional offices do not classify the positions. (Def.'s Stmt. ¶ 24.) At the time of Palermo's request for a desk audit, the Passport Operations Officer was classified as a GS-11 position at the majority of State Department offices, with three offices having the position classified at the GS-12 level. (Casey Decl. ¶ 23.) There was no GS-12 Passport Operations Officer position in the Chicago Office. (Def.'s Stmt. ¶ 29.)

After Palermo informed Williams, an African-American woman and the Assistant Regional Director of the Chicago Passport Agency, that he wanted a desk audit in May 2006, Williams informed Florence Fultz, a Caucasian woman and the State Department's Director of Field Operations in Washington, of Palermo's request. (Def.'s Stmt. ¶ 7; Casey Decl. ¶ 8; Decl. of Britany Williams ("Williams Decl."), Pl.'s Ex. 3 (Doc. 45-1), ¶ 41.) In late June 2006, Herbert Casey, an African-American man and the Director of Human Resources in the Bureau of Consular Affairs, contacted Fultz and Gary Roach[3] asking if they were dealing with Palermo's request for the audit. (*See* Casey Decl. ¶ 8; June 30, 2006 Email Chain between Casey, Fultz, and Roach ("June 30 Email Chain"), Pl.'s Ex. 12 (Doc. 45-2), at 1.) Roach responded that he thought "this is [] one of those cases that could backfire on the employee."[4] (June 30 Email

---

[3] The parties did not inform the court of Gary Roach's position at the State Department or role in the desk audit.

[4] Palermo incorrectly asserts that this statement was made by Fultz. (*See* Pl.'s Stmt. ¶ 15.)

Chain at 2.) Fultz originally responded to Roach's and Casey's emails by writing, "Unless we can say 'no', based on our view that it would not warrant an upgrade, I guess the next step is to do it. I would be interested in seeing what aspects of his duties he thinks warrant the upgrade." (*Id.* at 1.) When asked by Casey if she concurred with Palermo's request, Fultz stated, "I don't think it will merit a GS-12. Do we have the option of saying no?" (*Id.*) After Casey informed Fultz that she could say no to the request, Fultz told Casey that, after speaking with Britany Williams, Fultz had "no objections to proceeding with [Palermo's] request," because Williams "[did] not think there is any risk of a downgrade with a desk audit." (*Id.*) At some point in July, Casey initiated the desk audit of Palermo's position. (*See* Casey Decl. ¶¶ 4, 8; Def.'s Stmt. ¶ 34)

As part of the desk audit, Casey sent an email on July 31, 2006 requesting that Palermo provide information regarding the duties he performed that he believed should be considered in the desk audit. (Def.'s Stmt. ¶ 11; Casey Decl. ¶ 9.) Palermo responded to this inquiry by listing his additional duties. (Casey Decl. ¶ 9.) On August 9, 2006, Casey sent Palermo's response to Williams and Green for confirmation of Palermo's additional duties. (*Id.*) Green is an African-American woman and the Regional Director of the Chicago Passport Agency. The supervisors responded to Casey on August 17, 2006. (*Id.*) Based on these responses, Casey concluded that Palermo's additional duties that were performed with regularity included distributing transit checks, scheduling of staff for a compressed work schedule, and serving as EMT coordinator and supply manager. (October 23, 2006 Desk Audit Result Letter from Casey to Palermo ("Audit Results Letter"), Def.'s Ex. 10 (Doc. 42-6), at 1; Casey Decl. ¶¶ 18-20.) However, Casey concluded that the other additional duties listed by Palermo, including shredding passport

4

books,[5] auditing applications,[6] having override authority, and serving as supervisory manager, were not performed with sufficient frequency to be grade-controlling. (Audit Result Letter at 1; Casey Decl. ¶ 17.)

In performing the audit, Casey consulted with George Youravich, a contract consultant, asking him to review the position descriptions for the different grade levels for the Passport Operations Officer positions and discussing the additional duties Palermo identified. (Decl. of George Youravich ("Youravich Decl."), Def.'s Ex. 9 (Doc. 42-6), ¶¶ 5-6; Casey Decl. ¶ 14.) Youravich advised that the tasks Palermo listed as his duties did not appear to be at the GS-12 level. (Pl.'s Stmt. ¶ 25; *see also* Youravich Decl. ¶¶ 5-6; Casey Decl. ¶ 14.) Casey ultimately determined that Palermo's position was properly classified at a GS-11 level based on the "duties and complexity" of the work Palermo performed. (Pl.'s Stmt. ¶ 23; Casey Decl. ¶ 13; Audit Result Letter at 1.) Casey sent a letter to Palermo informing him of the results of the desk audit on October 23, 2006. (*See* Audit Result Letter.)

**B. Palermo's Relationship with his Supervisors**

In late July 2006, while the audit was being conducted, Williams and Palermo engaged in a somewhat testy discussion over email about the fact that Palermo had been denied a promotion to the position of Fraud Prevention Manager. (*See* Will Call Reprimand Email Chain, Pl.'s Ex. 7 (Doc. 45-2), at 2-4.) Palermo implied that the failure to promote him was the result of discrimination. (*See id.*) On August 2, 2006, Williams forwarded the emails to Casey, Fultz,

---

[5] According to Williams' declaration, Palermo assisted with shredding passports only between June and September 2006 before a new Fraud Prevention Manager had arrived. (Williams Decl. ¶ 26.) After that time, the Fraud Prevention Manager took over the task. (*Id.*)

[6] The parties dispute how much time Palermo spent auditing passports. According to Williams' declaration, Palermo was the only employee assisting her with this task until August 2006. (Williams Decl. ¶ 12.) Palermo estimated he spent 25-30% of his day auditing, (Dep. of Anthony Palermo, Pl.'s Ex. 15 (Doc. 45-2) at 69-70), and Williams estimated that prior to August 2006 Palermo spent approximately 20% of his time auditing, and after August 2006 spent approximately 10% of his time auditing (Williams Decl. ¶ 12).

Roach, and Green, asking for guidance. (Will Call Reprimand Email Chain at 1-2.) Williams' email stated that Palermo:

> is taking exception to his non-selection to the Fraud Prevention Manager Position. While he has generally been cooperative in his role as Operations Officer, his response below does not come as a complete surprise, as it is consistent with the pattern he has maintained over the past few years.

(*Id.*; *see* Pl.'s Stmt. ¶ 13.) In this August 2nd email, Williams also asked if there had been "any progress on the desk audit Mr. Palermo requested." (Will Call Reprimand Email Chain at 1-2.) Casey responded on August 2nd, saying that he thought it was better not to respond to Palermo about the Fraud Prevention Manager dispute, and indicating that he was going to be sending Green, Fultz, Roach, and Williams a copy of the answers Palermo provided about his additional duties for verification. (*Id.* at 1.) In his email, Casey stated, "Much of [Palermo's] argument for upgrading his job centers on the GS-12 position in New Orleans which can't be used since he's not doing that work." (*Id.*)

On August 27, 2006, Williams emailed Palermo:

Hi Anthony,

Tony is realigning operations in the processing section per my instructions. Delivering will calls to the will call window is a function of the quality control staff and they should perform the function as instructed by the processing supervisors. You have a number of other projects/assignments that I consider more important to occupy your time. Please discontinue retrieving will calls unless I or Ms. Green instruct otherwise.

(Aug. 27-29 Email Chain between Williams and Casey, Re: QC to will call ("QC to will call Email Chain"), Pl.'s Ex. 11 (Doc. 45-2), at 2.)[7] Palermo's response email, which he also sent to Green, Fultz, and Ann Barrett, objected to the "change in [his] work status and duties," asked if the exclusion from will call extended to the rest of "the management staff or passport specialists"

---

[7] Nowhere in the briefing do the parties explain "will call."

or just to him, and stated that "I intend to escalate this as necessary." (*Id.*) On August 28, 2006, Williams drafted a response email to send to Palermo, which she first sent to Herbert Casey to review, copying Fultz, Green, and Barrett. (*Id.* at 1.) Williams' email to Casey stated:

> This is beyond out of control.
>
> I have and will continue to take the high road as long as necessary, but my patience is wearing very thin. . . . Gail Neelon suggested that I run this past [the HR department].

(*Id.*; *see* Pl.'s Stmt. ¶ 12.) Casey responded to Williams, counseling her to answer Palermo in a tempered but firm manner. (QC to will call Email Chain at 1.)

On September 8, 2006, Green and Williams had a meeting with Palermo regarding complaints about Palermo from female employees. (*See* Pl.'s Stmt. ¶ 7; *see also* Palermo's Handwritten Notes from Sept. 8, 2006 Meeting ("Palermo's Sept. 8 Meeting Notes"), Pl.'s Ex. 2 (Doc 45-1) at 25-27.) Palermo's notes of the meeting[8] indicate that Williams discussed complaints from female employees and reference allegations that Palermo made suggestive jokes, stared at employees, and made "comments about physical attributes of female employees." (Palermo's Sept. 8 Meeting Notes at 25.) Palermo's notes also state that "During this meeting B.W. [Britany Williams] did reference my having filed a complaint against her & Terry G[reen]." (*Id.* at 27.) Williams sent an email about this meeting to Fultz and Casey on September 8, 2006, and stated that "As usual, Mr. Palermo was adversarial throughout, reminding us that he had an attorney on retainer . . . and accusing Ms. Green and me of inappropriately altering his work status and duties as a result of unfounded allegations." (Sept. 8, 2006 Email from Williams, re: Sept. 8 Meeting with CG Operations Officer ("Sept. 8, 2006 Williams Email"), Pl.'s Ex. 10 (Doc. 45-2.); Pl.'s Stmt. ¶ 11.) Williams also stated that "It was

---

[8] Although the notes are dated September 8, 2006 and appear to reflect the September 8th meeting, it is unknown when they were made.

7

not lost on me that he specifically mentions the 'African-American' contract supervisor. From that statement, I can surmise where he is taking this next." (Sept. 8, 2006 Williams Email; Pl.'s Stmt. ¶ 8.) On October 12, 2006, Williams sent an email to Casey, Green, and Fultz informing them that Palermo had contacted an EEO Counselor regarding the September 8, 2006 meeting. (Pl.'s Stmt. ¶ 5; Oct. 12, 2006 Email from Williams, Pl.'s Ex. 6 (Doc. 45-2).)

Also in September 2006, Palermo and Williams had yet another testy exchange over email. This time, they fought over a memo that Palermo had drafted for Williams. (*See* Training Outline Email Chain between Palermo and Williams, Pl.'s Ex. 9 (Doc. 45-2), at 126-130.) In a September 7 email, Palermo complained about Williams' attempt to "micromanage" his duties and about the amount of time required to complete all the work he had been assigned. (*Id.* at 127-28.) Almost two weeks later, Williams responded to this email, stating that she was "troubled" that Palermo claimed to be taking work home. (*Id.* at 127.) She requested that Palermo provide her with a list of all tasks he performs, the average amount of time he spent performing them, and to keep a daily diary of all planned and unplanned activities for four weeks. (*Id.*; *see* Pl.'s Stmt. ¶ 9-10) Palermo responded to this email by writing:

> I don't need your assistance in managing my priorities, I'm doing well on my own thanks. However since your intention appears to be retaliatory as demonstrated in the Friday Sept. 8th meeting I will provide the requested information . . . .

(*Id.* at 126-27.)

## II. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of

8

an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden, even if the other party has the burden of proof at trial. *Id.* at 323. The moving party can satisfy its burden either by presenting evidence that negates the opponent's claims, or demonstrating that the opponent will be unable to meet its burden at trial because of an absence of evidence on an essential element. *Id.* at 325. If the moving party meets its burden, the burden shifts to the opponent to show that a fact is genuinely disputed, requiring the non-moving party to demonstrate that it will be able to present evidence which would permit a jury to find in its favor. *Id.* at 323-24.

All facts, and any inferences to be drawn from them, must be viewed in the light most favorable to the non-moving party. *Wis. Cent. Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008). The evidence presented at this stage must comport with the Federal Rules of Evidence and be admissible at trial, *United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010), or it must consist of affidavits or declarations "made on personal knowledge, set[ting] out facts that would be admissible in evidence, and show[ing] that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

### III. ANALYSIS

#### A. Palermo's Retaliation Claim

Title VII prohibits an employer from discriminating against an employee "who 'has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII.'" *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009) (quoting 42 U.S.C. § 2000e-3(a)). In order to succeed, Palermo "must demonstrate that (1) he engaged in a statutorily protected activity; (2) he suffered a materially adverse action by his employer; and (3)

a causal connection exists between the two."[9] *Id.* at 786; *accord O'Neal v. City of Chi.*, 588 F.3d 406, 409 (7th Cir. 2009). "Failure to satisfy any one element of the *prima facie* case is fatal to an employee's retaliation claim." *Roney v. Ill. Dep't of Transp.*, 474 F.3d 455, 459 (7th Cir. 2007) (quotation and citation omitted).

The parties agree that Palermo engaged in statutorily protected activity as he filed EEO complaints on November 21, 2003, March 22, 2004, and September 22, 2006, and brought a Title VII claim in federal court on September 10, 2004. The State Department argues that Palermo cannot prove he suffered a materially adverse action or that any action was connected to his protected activity.

Palermo points to two types of adverse action. First, he points to the desk audit conclusion that his position was properly classified at a GS-11. The court will assume that the desk audit result was a materially adverse action because, as explained below, it is clear that Palermo has not demonstrated a causal connection between the protected activity and the desk audit. Second, he asserts that his supervisors relieved him of certain job duties, specifically: (a) in September 2006, Palermo stopped shredding passports, (b) in August 2006, he began sharing responsibility for doing passport audits, (c) in August 2006, Williams instructed Palermo to stop visiting the will call window, and (d) sometime befoe March 2007, Palermo's "override authority was removed." A materially adverse action in a retaliation case is "one that well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *O'Neal*, 588 F.3d at 409 (quotation and citation omitted). Palermo's second argument fails because, a slight change in responsibilities does not constitute an adverse action. *See Stephens*, 569 F.3d at 791-92 ("Our decisions involving a transfer or reassignment of job responsibilities indicate that

---

[9] Although a Title VII plaintiff can proceed under either the direct or indirect methods of proof, *Stephens*, 569 F.3d at 786, Palermo argues only that he can satisfy the direct method. Accordingly, the court limits its discussion to the appropriate standard.

such an action is not materially adverse unless it represents a *significant* alteration to the employee's duties, which is often reflected by a corresponding change in work hours, compensation, or career prospects.") (emphasis in original). Palermo has not presented any evidence that these actions constituted a significant alteration of his duties. (In fact, the court is unable to discern what "override authority" could be or how it affected Palermo's job.) Palermo would have a stronger argument if he could produce evidence suggesting that the removal of responsibilities led to Casey classifying him at GS-11. *Cf. O'Neal*, 558 F.3d at 406 (noting "A lateral job transfer within an organization may constitute an adverse employment action, for example, if it reduces the employee's 'opportunities for advancement'"). But Palermo does not identify any evidence that Casey's decision turned on the fact that Palermo's duties had changed.[10]

To prove causation, the plaintiff can either offer "direct evidence that would prove the fact in question – the discriminatory intent – without reliance on inference or presumption, or 'a convincing mosaic' of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Silverman v. Bd. of Educ. of City of Chi.*, --- F.3d ---, 2011 WL 941518, at *2 (7th Cir. Mar. 21 2011) (citations omitted); *accord Stephens*, 569 F.3d at 787. Under the mosaic approach, a plaintiff can present any of three "broad" types of circumstantial evidence, including: (1) circumstantial evidence of suspicious timing, and ambiguous oral or written statements, (2) evidence that the employer treated a similarly situated employee who did not engage in the protected behavior better, or (3) evidence that the employer's justification for the adverse action is pretextual. *Silverman*, 2011 WL 941518, at *3.

---

[10] Palermo's Rule 56.1 Statement states, "Shredding passport books and auditing applications were tasks Casey stated would have warranted a grade increase." (Pl.'s Stmt. ¶ 32.) However, the evidence cited in this paragraph does not support the assertion.

11

Here, the decisionmaker determining the results of Palermo's desk audit was Casey. Casey conducted the desk audit of Palermo's position and made the determination that the position should not be reclassified at a GS-12 level. *See Schandelmeier-Bartels v. Chi. Park Dist.*, --- F.3d ---, 2011 WL 383021, at *4 (7th Cir. Feb. 8, 2011) ("A decisionmaker is the person 'responsible for the contested decision.'" (quoting *Rogers v. City of Chi.*, 320 F.3d 748, 754 (7th Cir. 2003)). Because Palermo has not provided any direct evidence that Casey intended to retaliate against him, he must present a convincing mosaic of evidence that would allow a rational jury to infer intentional retaliation by the decisionmaker. *See Stephens*, 569 F.3d at 787. Palermo argues that animus can be inferred from the fact that Casey learned of Palermo's latest EEO complaint on October 12, 2006 and the result of the desk audit was announced on October 23, 2006. However, timing alone is not enough to prove retaliation. *See Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002) ("[M]ere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue."). Palermo does not point to any other circumstantial evidence demonstrating Casey's retaliatory animus. This circumstantial evidence falls far short of being a "convincing mosaic of evidence."

Palermo next argues that Casey's evaluation "was not wholly independent" of Williams, Green, and Fultz, who were in close contact with Casey throughout the desk audit process. (Pl.'s Opp'n at 7.) This argument appears to be Palermo's version of the "cat's paw" theory, which, in the employment discrimination and retaliation context, refers to "the unwitting manager or supervisor who is persuaded to act based on another's illegal bias." *Schandelmeier-Bartels*, 2011 WL 383021, at *4. The Supreme Court and Seventh Circuit both recognize that a non-decisionmaker's illegal animus can infect a decisionmaker. *See id.*; *Staub v. Proctor Hosp.*, 131

S. Ct. 1186, 1194 (2011) (holding that an employer is liable if a supervisor intends to cause an adverse employment action, performs an act motivated by discriminatory animus, and that act "is a proximate cause of the ultimate employment action"). However, the plaintiff must present sufficient evidence to demonstrate that a supervisor's discriminatorily-motivated act was a proximate cause of the adverse employment action. *Staub*, 131 S. Ct. at 1194; *see also Metzger v. Ill. State Police*, 519 F.3d 677, 682 (7th Cir. 2008) (holding that the state police's denial of plaintiff's request to reclassify the plaintiff's position was not retaliatory because the plaintiff failed to provide evidence that a biased supervisor's communications influenced the audit of the position). It follows that in order to show that a supervisor impermissibly influenced a decisionmaker, a plaintiff must first show that the supervisor acted in retaliation for the plaintiff's statutorily protected activity. *See Willis v. Marion Cnty. Auditor's Office*, 118 F.3d 542, 546-47 (7th Cir. 1997) (reaching cat's paw analysis only after plaintiff proffered evidence from which a reasonable jury could conclude that a non-decisionmaker had a retaliatory animus); *Long v. Teachers' Ret. Sys. of State of Ill.*, 566 F. Supp. 2d 851, 859-62 (C.D. Ill. 2008) (same).

In an attempt to prove animus on the part of Williams and Green, Palermo points to his notes from the September 8th meeting which state, "During this meeting B.W. did reference my having filed a complaint against her & Terry G." (Palermo's Sept. 8 Meeting Notes at 27.) And in his declaration, Palermo states, "My supervisors are aware of my prior EEO activity, particularly the 2003 matter, because in a meeting on September 8, 2006, Ms. Williams stated in the presence of Ms. Green that she was aware I made accusations against them in a prior EEO matter." (Decl. of Anthony Palermo, Pl.'s Ex. 1 (Doc. 45-1) ¶ 5.) Palermo also asserts that Williams "repeatedly cast Plaintiff in a negative light to her superiors throughout the desk audit process." (Pl.'s Opp'n at 8.) To support this assertion, Palermo references Williams' September

8 email which stated, "As usual, Mr. Palermo was adversarial throughout [the September 8 meeting]," and Williams' August 2, 2006 email which stated that Palermo's response to not getting the Fraud Prevention Manager position "does not come as a complete surprise, as it is consistent with the pattern he has maintained over the past few years." (Will Call Reprimand Email Chain, Pl.'s Ex. 7 at 1.) These oblique references to Palermo's attitude and EEO complaints do not in anyway suggest that Williams or Green harbored animus or planned to retaliate. The comments are largely factual statements which do not support the inference that Palermo would ascribe to them. *Cf. Rothman v. Emory Univ.*, 123 F.3d 446, 451 (7th Cir. 1997) (holding that the defendant's letter describing the plaintiff's epilepsy in factual terms did not suggest any discriminatory animus).

Palermo argues that, after the September 8, 2006 meeting, Williams anticipated that Palermo would be filing another EEO complaint, and that, in an act of preemptory-retaliation, Williams ordered Palermo to undertake onerous new tasks. Specifically, on September 19, 2006, Williams responded to Palermo's email, in which he had complained about his heavy work load, and she directed Palermo to make a detailed list of his job duties. This argument is not convincing, in part because writing a list of duties is not an onerous burden and in part, as the court already explained, because "mere temporal proximity" between the meeting and Williams' email does not alone suggest retaliatory animus.

Palermo has even less evidence suggesting Fultz had a retaliatory motive. Palermo argues that Fultz's retaliatory animus is demonstrated by her initial reaction to Palermo's request for a desk audit because she wanted to deny Palermo's request and didn't believe his position merited an upgrade. (Pl.'s Opp'n at 9.) This evidence does not indicate any animus on the part

of Fultz, and has no obvious connection to Palermo's past EEO claims.[11] The emails merely state that while Fultz did not believe Palermo's position warranted an upgrade, she was concerned that his position could be downgraded, but did not want "to be the obstacle" in the way of Palermo's request for a desk audit. (*See* June 30 Email Chain at 1-2.)

Even if the court assumes that Palermo's supervisors were out to get him, he has not identified any evidence that this animus affected Casey's decision. Although the supervisors communicated with Casey by email, Casey's decision appears to have been based on the duties performed by Palermo and the independent analysis by Youravich. There is no evidence that the supervisors' input influenced Casey's decision. The court is not a "superpersonnel department" that will second guess the State Department's determination that Palermo's position was properly classified at the GS-11 level. *See Healy v. City of Chi.*, 450 F.3d 732, 742 n.12 (7th Cir. 2006) (quoting *Blise v. Antaramian*, 409 F.3d 861, 868 (7th Cir. 2005) and *Holmes v. Potter*, 384 F.3d 356, 361-62 (7th Cir. 2004). The court's role "is simply to determine whether a rational jury, when viewing the facts in the light most favorable to [the plaintiff], could find that the [defendant] violated Title VII . . . ." *Metzger*, 519 F.3d at 685. Because a rational jury could not find that the result of Palermo's desk audit was motivated by retaliatory animus, the defendant's motion for summary judgment is granted on Palermo's retaliation claim.

## B. Palermo's Gender and Racial Discrimination Claims

Palermo has failed to provide sufficient evidence to support a *prima facie* case of gender or racial discrimination. For his racial and gender discrimination claims, Palermo attempts to proceed under the *McDonnell Douglas* indirect method of proof, citing to *Johnson v. Nordstrom*

---

[11] The State Department admits that Fultz had been opposed to settling with Palermo on his past claim. However, Fultz's past concerns about settling with Palermo were over a year old, and thus do not lead to any inference of retaliatory animus. *See e.g., Haywood v. Lucent Techs., Inc*. 323 F.3d 524, 532 (7th Cir. 2003) ("[A one year] time period is far too long – at least on this record – to allow a reasonable fact-finder to infer that [the plaintiff's] termination was causally related to the filing of her complaint.")

*Inc.*, 260 F.3d 727, 732 (7th Cir. 2001), (*see* Pl.'s Opp'n at 9-10), which describes the indirect method's burden shifting analysis. *See Johnson*, 260 F.3d at 731-32 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973)). To make out a *prima facie* case of discrimination Palermo must demonstrate that "(1) [he] is a member of a protected class, (2) [he] met [his] employer's legitimate job expectations, (3) [he] suffered an adverse employment action, and (4) similarly situated employees outside of the protected class received more favorable treatment." *Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 477 (7th Cir. 2010) (citing *Lucas v. PyraMax Bank, FSB*, 539 F.3d 661, 666 (7th Cir. 2008)). "It is the plaintiff's burden to put forth evidence of employees outside of the protected class who might have been treated differently . . . ." *Dear v. Shinseki*, 578 F.3d 605, 610 (7th Cir. 2009). "To be considered 'similarly situated,' a plaintiff and his comparators (those alleged to have been treated more favorably) must be identical or directly comparable in all material respects." *LaBella Winnetka, Inc. v. Vill. of Winnetka*, 628 F.3d 937, 942 (7th Cir. 2010). A claim of discrimination cannot survive summary judgment unless specific evidence is produced demonstrating who the comparators are and how they are similar. *Maulding Dev., LLC v. City of Springfield, Ill.*, 453 F.3d 967, 971 (7th Cir. 2006). "In deciding whether someone is comparable . . . , we consider all relevant factors, including whether the employee (1) held the same job description; (2) was subject to the same standards; (3) was subordinate to the same supervisor; and (4) had comparable experience, education, and other qualifications." *Dear*, 578 F.3d at 610 (citing *Bio v. Fed. Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005)).

Palermo argues that his supervisors placed restrictions on his activities and reduced his duties, and that "only" Palermo suffered this fate. This sort of generalization is not specific enough to meet Palermo's burden. *See Maulding*, 453 F.3d at 971. Palermo points to his

deposition testimony where he was asked specifically about other State Department employees whom he thought had received more favorable treatment. While Palermo testified about his beliefs as to some potential comparators, this testimony is inadequate to demonstrate how the comparators are similar. (*See* Dep. of Anthony Palermo at 114-19.) Palermo testified that Alexis Kiyak, a female, was offered a promotion to operations officer. (*Id.* at 114-16.) According to Palermo, Williams offered Kiyak the promotion at a time when Palermo had not been selected for the same job. (*Id.* at 115.) However, Palermo testified that he did not know whether Kiyak was qualified, and Kiyak never actually served as an operations officer. (*Id.* at 115-16.) In fact, Palermo was eventually promoted to the operations officer position. (*Id*.) Palermo also identified Bernice Brewer, Kathy Miller, and Francetta Stearns, all females, as being hired as passport supervisors. (*Id.* at 116-19.) However, Palermo testified that he did not know anything about these women's qualifications, other than that they were "first-time applicants." (*Id.*) Moreover, Palermo testified that he never applied for any of the positions filled by Brewer, Miller, or Stearns. (*Id.* at 117-19.)

Other than this deposition testimony, inadequate to meet the Seventh Circuit's test for true comparators, Palermo has not pointed to any other evidence in the record pertaining to similarly situated employees who were treated more favorably. Thus, Palermo has not met his burden to come forward with evidence of similarly situated employees outside of the protected class who were treated differently than Palermo. *See Dear*, 578 F.3d at 610. Under Seventh Circuit precedent, Palermo's evidence is simply inadequate to make out a *prima facie* case of discrimination.

## IV. CONCLUSION

For the foregoing reasons, the State Department's motion for summary judgment is granted.

ENTER:

/s/

JOAN B. GOTTSCHALL
United States District Judge

DATED: March 31, 2011